**IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 12-CR-801** |
| **v.** | ) | |
| | ) | **Hon. Elaine E. Bucklo** |
| **ABDULILAH AL MUJAHID** | ) | |
| | ) | |

**<u>MOTION TO SUPPRESS EVIDENCE WITH SUPPORTING MEMORANDUM</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF FACTS ................................................................ 1

ARGUMENT ................................................................ 4

    I.    This Court Should Suppress Evidence Seized During the Search of Claudette Gregory's Residence Because Claudette Did Not Have Actual or Apparent Authority to Consent to the Search of the Storage Tub. ........................................ 4

    II.    This Court Should Suppress Evidence Seized During the Search of Mr. Al Mujahid's Residence Because That Search Was Not Justified by Exigent Circumstances. ................................................................ 10

        A.    The search of Mr. Al Mujahid's residence was an illegal search because it was unreasonable for police officers to enter his residence. ...................... 10

        B.    Even if entering Mr. Al Mujahid's residence was reasonable, the scope of the search was unreasonable. ..................................................... 14

    III.    This Court Should Suppress Mr. Al Mujahid's Post-Arrest Statements Because There Is Insufficient Proof that Mr. Al Mujahid Received *Miranda* Warnings, Knowingly and Intelligently Waived His *Miranda* Rights, and Voluntarily Made the Statements. ................................................................ 15

        A.    The government has not carried its burden of proving Mr. Al Mujahid was given *Miranda* warnings before his interrogation. ..................................... 15

        B.    The government has not carried its burden of proving that Mr. Al Mujahid knowingly, intelligently, and voluntarily waived his *Miranda* rights. ........ 16

        C.    Mr. Al Mujahid requests an evidentiary hearing on the voluntariness of his alleged confession. ..................................................... 18

    IV.    This Court Should Grant Leave to File Further Pre-Trial Motions as the Interests of Justice Require. ..................................................... 20

REQUEST FOR RELIEF ................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Fulminante*,
499 U.S. 279 (1991) .................................................................................................. 18

*Berkemer v. McCarty*,
468 U.S. 420 (1984) .................................................................................................. 16

*Blackburn v. Alabama*,
361 U.S. 199 (1960) .................................................................................................. 19

*Bram v. United States*,
168 U.S. 532 (1897) .................................................................................................. 19

*Brigham City v. Stuart*,
547 U.S. 398 (2006) .................................................................................................. 10

*Colorado v. Connelly*,
479 U.S. 157 (1986) .................................................................................................. 17

*Colorado v. Spring*,
479 U.S. 564 (1987) .................................................................................................. 18

*Edwards v. Arizona*,
451 U.S. 477 (1974) .................................................................................................. 16

*Garner v. Mitchell*,
557 F.3d 257 (6th Cir. 2009) .................................................................................... 18

*Hutto v. Ross*,
429 U.S. 28 (1976) .................................................................................................... 19

*Illinois v. Rodriguez*,
497 U.S. 177 (1990) .................................................................................................... 5

*Jackson v. Denno*,
378 U.S. 368 (1964) .................................................................................................. 18

*Katz v. United States*,
389 U.S. 347 (1967) .................................................................................................... 4

*Lego v. Twomey*,
404 U.S. 477 (1972) .................................................................................................. 18

*Lord v. Duckworth*,
    29 F.3d 1216 (7th Cir. 1994) ................................................................ 19

*Malloy v. Hogan*,
    378 U.S. 1 (1964) ................................................................................... 19

*Mincey v. Arizona*,
    437 U.S. 385 (1978) ...................................................................... 4, 10, 14

*Miranda v. Arizona*,
    384 U.S. 436 (1966) ................................................... 15, 16, 17, 18

*Schneckloth v. Bustamonte*,
    412 U.S. 218 (1973) ................................................................................ 19

*Townsend v. Sain*,
    372 U.S. 293 (1963) ................................................................................ 19

*United States v. Aldridge*,
    642 F.3d 537 (7th Cir. 2011) .................................................................. 9

*United States v. Ambrose*,
    668 F.3d 943 (7th Cir. 2012) ................................................................ 16

*United States v. Andrews*,
    442 F.3d 996 (7th Cir. 2006) ................................................................ 10

*United States v. Basinski*,
    226 F.3d 829 (7th Cir. 2000) .................................................... 5, 6, 7, 8

*United States v. D'Antoni*,
    856 F.2d 975 (7th Cir. 1988) ................................................................ 17

*United States v. Denberg*,
    212 F.3d 987 (7th Cir. 2000) .................................................................. 4

*United States v. Dickerson*,
    530 U.S. 428 (2000) ................................................................................ 15

*United States v. Fultz*,
    146 F.3d 1102 (9th Cir. 1998) .......................................................... 5, 6

*United States v. Gevedon*,
    214 F.3d 807 (7th Cir. 2000) .................................................................. 5

*United States v. Infante–Ruiz*,
    13 F.3d 498 (1st Cir. 1994) ..................................................................... 9

*United States v. Jackson*,

   300 F.3d 740 (7th Cir. 2002) ............................................... 16

*United States v. James*,

   571 F.3d 707 (7th Cir. 2009) ................................................. 9

*United States v. Marshall*,

   157 F.3d 477 (7th Cir. 1998) ............................................... 10

*United States v. Matlock*,

   415 U.S. 164 (1974).............................................................. 5

*United States v. Montgomery,*

   555 F.3d 623 (7th Cir. 2009) ............................................... 19

*United States v. Randle,*

   966 F.2d 1209 (7th Cir. 1992) ............................................. 16

*United States v. Rivera*,

   248 F.3d 677 (7th Cir. 2001) ............................................... 10

*United States v. Spruill*,

   296 F.3d 580 (7th Cir. 2002) ........................................ 17, 18

*United States v. Stefonek*,

   179 F.3d 1030 (7th Cir. 1999) ............................................... 4

*United States v. Upton*,

   512 F.3d 394 (7th Cir. 2008) ............................................... 17

*United States v. Welch*,

   4 F.3d 761 (9th Cir. 1993) ..................................................... 5

*United States v. Wilson*,

   536 F.2d 883 (9th Cir. 1976) ................................................. 8

*United States v. Wysinger*,

   683 F.3d 784 (7th Cir. 2012) ............................................... 16

*United States v. Yang*,

   478 F.3d 832 (7th Cir. 2007) ................................................. 7

**Statutes**

18 U.S.C. § 3501 ..................................................... 14, 17, 18

Defendant ABDULILAH AL MUJAHID, by the University of Chicago Law School's Federal Criminal Justice Clinic and its attorney, ERICA ZUNKEL, respectfully moves this Honorable Court to suppress (1) all fruits of the unlawful search conducted by the Chicago Police Department at the residence of Claudette Gregory; (2) all fruits of the unlawful search conducted by the Chicago Police Department at the residence of Mr. Al Mujahid; and (3) all post-arrest statements made by Mr. Al Mujahid. Mr. Al Mujahid brings these motions pursuant to the Fourth and Fifth Amendments of the United States Constitution and Rule 12(b)(3) of the Federal Rules of Criminal Procedure. In further support of these motions, Mr. Al Mujahid submits the following:

### STATEMENT OF FACTS[1]

On April 13, 2012, Candace Gregory decided she wanted to turn her ex-boyfriend, Mr. Al Mujahid, in to the police for possessing guns. *See* Exh. A (FBI Report) at 1. Earlier that morning, Candace and Mr. Al Mujahid had met up to walk their son, Caliph, to day care. Exh. B (FBI Report) at 2. Caliph typically spent the evenings with Candace at Claudette's residence (Claudette is Candace's mom), and in the mornings, Mr. Al Mujahid would meet up with them to take over responsibility for Caliph so that Candace could go to work. *See* Exh. C (Velvet Cotton Declaration) at ¶4. On this particular morning, Candace and Mr. Al Mujahid got into an argument, and according to Candace, Mr. Al Mujahid allegedly struck her and walked away with Caliph. Exh. A at 2. Candace called the police, and when they arrived on the scene, she stated that Mr. Al Mujahid had hit her. *Id.* at 2–3. Shortly thereafter, she contacted an attorney, Mike Levinsohn, who had previously represented Mr. Al Mujahid. *Id.* at 3. Levinsohn then contacted

---

[1] Unless otherwise stated, the "facts" referenced in these papers come from government-produced discovery that the defense continues to investigate. Mr. Al Mujahid does not admit the accuracy of this information and reserves the right to challenge it at any time.

1

Martin Teresi, a Chicago police officer, and explained Candace's desire to turn her ex-boyfriend in because he had guns hidden at Claudette's residence. *See id.* Officer Teresi then met Candace, Levinsohn, and Claudette at the courthouse to discuss their plans. *Id.* That morning was the first time Claudette learned about the presence of firearms in her residence. Exh. D (FBI Report). Candace told officers that Mr. Al Mujahid had instructed her not to touch the firearms. Exh. E at 8.

After the meeting at the courthouse, Claudette, Officer Teresi, and several other police officers went to Candace's current residence at the time, an apartment leased to Claudette. Exh. E (Chicago Police Department Arrest Report) at 8. Claudette signed a consent form that purported to authorize Chicago police officers to search her apartment, 4858 S. Vincennes Ave, Apt. 400. *Id*. During this first warrantless search, officers found several firearms in a green duffel bag hidden in a storage tub. *Id*. The storage tub was located inside a closet in Candace's room. *See* Exh. F (FBI Report). The tub was in the back of the closet, and a dresser and other items were on top of the storage tub. *See id.*; *see also* Exh. G (4/13/12 Chicago Police Department Photographs).

At some point before or during the search of Claudette's residence,[2] Candace told police that she did not know where her son was. *Compare* Exh. B at 2–3 *with* Exh. H at 1. And sometime during or after the search, Candace also told police officers that Mr. Al Mujahid lived nearby. Exh. H at 2. After hearing that Candace did not know where Caliph was, the police decided to search Mr. Al Mujahid's apartment, 450 East 49th Street, Apartment 301. *Id.* The police found the maintenance manager, who gave them a key to the apartment front door. *Id.* The police entered Mr. Al Mujahid's residence without a warrant and searched the apartment. *Id.*

---

[2] As explained below in footnote 10, *infra*, the reports are inconsistent on the question of when, exactly, Candace first communicated this belief to the police officers.

During the search, Officer Teresi—the very same police officer who was first tipped off by Levinsohn about the guns' whereabouts—found two firearms, as well as some ammunition, "under [a] dresser." Exh. I (Gang Investigation Division Supp. Report) at 3.

After conducting this second warrantless search, the police proceeded to look for Mr. Al Mujahid at his sister's residence (his sister is Velvet Cotton). Prior to his arrest, Mr. Al Mujahid, who was with his son Caliph and an acquaintance, Enos "Kendall" Washington, were talking in the area outside the rear of Ms. Cotton's apartment. A Caucasian police officer jumped out of an unmarked police vehicle and ordered Mr. Al Mujahid to put his hands up. *See* Exh. J (Enos Washington Declaration) at ¶5. Soon after that, several more officers arrived on the scene. *Id.* at ¶6. Mr. Washington took Caliph inside while the officers stayed outside with Mr. Al Mujahid. *Id.* at ¶7.

Officers approached Mr. Al Mujahid, and one officer pushed Mr. Al Mujahid against a vehicle and forcefully pressed his face into its side. *See* Exh. K (Kenjah Brimage Declaration) at ¶7–8. The officer did something to Mr. Al Mujahid's hand, and a witness, Kenjah Brimage,[3] heard Mr. Al Mujahid cry out in pain. *Id.* at ¶ 9–10.

Sometime later, officers transported Mr. Al Mujahid to Area Central for processing. A Chicago Police Department report off-handedly notes that "post Miranda," Exh. E at 8, Mr. Al Mujahid had a conversation with officers about the guns in his bedroom at 448 E. 49th Street, and stated that "he wasn't out on the street shooting anyone with the guns." *Id*. He also allegedly told officers that he was the only one who stayed in that apartment.[4] *Id.* The government claims that only after making these statements did Mr. Al Mujahid invoke his right to remain silent. *Id*. The defense disputes this version of events.

---

[3] Ms. Brimage is Velvet Cotton's neighbor. Exh. K at ¶1–2.
[4] These are the only statements that the government alleges Mr. Al Mujahid made in the course of this case.

The defense has requested from the government any audio or video recordings of the alleged *Miranda* warnings and the subsequent interrogation, any written *Miranda* waiver form, and any written statement by Mr. Al Mujahid. The government has represented that none of these items exist.

## ARGUMENT

These motions raise three distinct legal issues, but all boil down to a consistent theme of overzealousness on the part of the police. First, the police violated the Fourth Amendment when they searched Claudette's residence. Second, the police violated the Fourth Amendment when they searched Mr. Al Mujahid's residence. Third, the police violated the Fifth Amendment during Mr. Al Mujahid's custodial interrogation. For all three issues, the facts show that the police repeatedly exceeded their constitutional authority and committed grave mistakes that require this Court to suppress evidence.

**I.      This Court Should Suppress Evidence Seized During the Search of Claudette Gregory's Residence Because Claudette Did Not Have Actual or Apparent Authority to Consent to the Search of the Storage Tub.**

The Fourth Amendment forbids all unreasonable searches and seizures. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). Warrantless searches are presumptively unreasonable unless subject to a "specifically established and well-delineated exception[]." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). The government bears the burden of establishing that the exception to the warrant requirement applies. *United States v. Denberg*, 212 F.3d 987, 991 (7th Cir. 2000) (citation omitted). When the government fails to demonstrate an exception to the warrant requirement, the evidence obtained through the search must be suppressed. *United States v. Stefonek*, 179 F.3d 1030, 1033 (7th Cir. 1999).

Third-party consent to search an item is one of these exceptions. *See, e.g.*, *United States v. Gevedon*, 214 F.3d 807, 810 (7th Cir. 2000) (citations omitted). The government bears the burden of showing that a third party is permitted to consent to a search of a defendant's property. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). The government can do so in only two ways: by showing that the third party had actual authority to consent to a search, or that the third party had apparent authority to consent, which exists when "a reasonable person, with the same knowledge of the situation as that possessed by the government agent to whom consent was given, would reasonably believe that the third party had authority over the area to be searched." *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) (citations omitted).

If the government wants to establish that a person has authority to consent to a search, the government must prove that the third party has "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). The Supreme Court has recognized that to have "common authority," a third party must (1) use the property and (2) have access to or control over it:

> The authority which justifies the third-party consent does not rest upon the law of property … but rests rather on mutual use of the property by persons generally having *joint access or control for most purposes* so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection … and that the others have assumed the risk that one … might permit the common area to be searched.

*Matlock*, 415 U.S at 171 n.7 (emphasis added).

Importantly, a person can retain an expectation of privacy in closed containers that are placed in locations that are generally controlled by the third party who consented to the search. *See, e.g.*, *Basinski*, 226 F.3d at 834–35 (7th Cir. 2000); *United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998) (no authority to consent to search of defendant's cardboard boxes left at third party's residence); *United States v. Welch*, 4 F.3d 761, 764–65 (9th Cir. 1993) (no authority

to consent to search of defendant's purse left in third party's car). In other words, the law distinguishes between control over a specific closed container and control over the broader location or premises where that specific closed container is located. A third party's mere possession of a closed container is insufficient to constitute authority to consent, even if that third party has control over the general area where the container is located. *Basinski*, 226 F.3d at 834 ("For purposes of searches of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents.") (citation omitted).

The critical inquiry is not about the third party's control of the premises as a whole, but instead "the third party's use of, control over, and access to the container to be searched." *Id.* (citations omitted); *see also Fultz*, 146 F.3d at 1106 (finding no authority to consent to search of boxes because "what matters is not whether [third party] had access to the *garage*, but whether she had mutual use and joint access to or control over the *boxes*") (emphasis in original). And "[b]ecause a reasonable person would be less likely to believe that a defendant granted free access to the contents of locked containers, also relevant are the precautions taken to ensure privacy, such as locks or the government's knowledge of the defendant's orders not to open the container." *Basinski*, 226 F.3d at 835 (citations omitted).

When items are left at a third party's residence and are placed in a way that indicates that the defendant intended to hide them or restrict access to them, courts have held that the third party lacked apparent authority to consent.[5] In *Basinski*, the Seventh Circuit found that a third party had no apparent authority to consent to the search of a locked briefcase that the defendant had given to the third party when the evidence demonstrated that the defendant had told his

---

[5] As discussed in footnote 8, *infra*, the government cannot prove Claudette had actual authority over the storage tub. Mr. Al Mujahid's arguments here focus on whether she had apparent authority to consent to the search.

friend to destroy the briefcase, the defendant had implicitly or explicitly told the third party "to never open the briefcase and to destroy its contents rather than allow anyone else to peer inside," and the third party did not have "access to, control over, or use of the interior of the case." *Basinski*, 226 F.3d at 835. Similarly, in *United States v. Davis*, 332 F.3d 1163 (9th Cir. 2003), the Ninth Circuit held that a co-resident of an apartment lacked authority to consent when the defendant's unlocked suitcase was in a room separate from the third party's belongings and underneath a bed. *See id.* at 1168, 1170.[6] The location of the property in *Davis*—"hidden under the bed" and not placed in an accessible location such as the kitchen—prevented the third party from having actual or apparent authority to consent to a search. *Id.* at 1169 n.4; *see also id.* ("Short of attaching to the bag an explicit 'No Trespassing' sign with his name on it, [defendant] could hardly have displayed a clearer 'exhibition of an actual expectation of privacy.' ") (citation omitted).

In at least three ways, Mr. Al Mujahid demonstrated that he had made a significant effort to hide the contents of the storage tub from Claudette and to prevent her from accessing the tub—an effort that renders her consent ineffective. First, the duffel bag containing the firearms was hidden inside a closed storage tub that was effectively locked. *See* Exh. G at 2. This tub was secreted in the back corner of a closet with a dresser and multiple items placed on top of it. *See id.* at 1; *see also* Exh. F. While this is not an actual lock, the dresser, coupled with the closed lid, served the same purpose as a lock: it effectively blocked third-party access to its contents. Furthermore, as *Davis* indicates, a defendant can retain a valid privacy interest in an unlocked container that is in a location and has markings that indicate that it was meant to be private.

---

[6] *Davis* has been cited favorably by the Seventh Circuit. *See United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007).

Second, Mr. Al Mujahid explicitly and implicitly exhibited his privacy interest in the storage tub's contents. He expressly told Candace *not* to touch the contents or open the container—information that Candace conveyed to the officers.[7] *See* Exh. I at 4. He also kept knowledge of the container from Claudette, as he never told her about it or gave her possession of it. In fact, Claudette first heard about Mr. Al Mujahid's storage tub on the very day she allowed police to search her residence.[8] *See* Exh. D. There is no evidence at all that she told officers the tub belonged to her and therefore no basis for the officers to believe that she had authority to consent to the search.

Third, the storage tub was placed in a location indicating that Claudette did not have "access to, control over, or use of the interior of [it]." *Basinski*, 226 F.3d at 835. The storage tub was in a room occupied solely by Candace, and Claudette never told officers that she used the closet inside the room, let alone that she accessed the interior of the storage tub. Claudette did

_____

[7] The government may argue that Candace had authority to consent to the search and provided implied consent when she directed officers to the closet where the storage tub was hidden. Like Claudette, Candace did not have actual or apparent authority to consent to the search of the storage tub. Candace told officers before the search that the storage tub belonged to her ex-boyfriend, Mr. Al Mujahid. *See* Exh. E at 8. In this way, Candace disclaimed any ownership of the tub and its contents. *See United States v. Wilson*, 536 F.2d 883, 885 (9th Cir. 1976) (defendant's girlfriend had no authority to consent to the search of suitcases left in her apartment when she disclaimed ownership of them). She also told officers that Mr. Al Mujahid instructed her not to touch the guns. *See* Exh. I at 4. Based on these facts, she "clearly had no actual authority over the contents" of the storage tub. *Basinski*, 226 F.3d at 834. She also had no apparent authority over the contents of the storage tub because there is no evidence that Candace told the officers that she had access to, control over, or use of the contents of the tub. In fact, she told them just the opposite: that Mr. Al-Mujahid had told her not to touch the guns. *See* Exh. E at 8. Thus, the government cannot rely on the doctrine of apparent authority because the officers had unambiguous information from Candace that she did not have authority over the contents of the storage tub. *See Basinski*, 226 F.3d at 834–35.

[8] It is undisputed that the storage tub did not belong to Claudette. She did not have access to the interior of the tub. She did not even know about the tub until Candace told her about it on the day she signed the general consent form for officers to search her premises. For all of these reasons, the government cannot prove that Claudette had actual authority to consent to search it. *See Basinski*, 226 F.3d at 834 (finding that where the third-party consenter did not own the briefcase to be searched and had not been given permission to open the closed container, he "clearly had no actual authority over the contents of the briefcase," leaving open only the possibility that he had apparent authority).

not have the requisite access to or use of the interior of the storage tub, given that its location was even more secluded than the suitcase in *Davis.*

All told, the contents of the tub were within five distinct layers of protection from Claudette: inside a duffel bag, inside a closed storage tub, under a dresser, inside a closet, and inside a room occupied by Candace. Mr. Al Mujahid clearly "attempted to limit or restrict [a third party's] control over" the item, indicating that Claudette Gregory lacked apparent authority to consent. *See United States v. James*, 571 F.3d 707, 714 (7th Cir. 2009). This is in sharp contrast to situations in which courts have found actual or apparent authority for a third party to consent. *See, e.g.*, *United States v. Aldridge*, 642 F.3d 537, 540, 543–44 (7th Cir. 2011) (authority to consent when a defendant gave his wife an unlocked box because there was "nothing to refute the conclusion that he had conferred joint custody over the box and its contents"); *United States v. Infante–Ruiz*, 13 F.3d 498, 504 (1st Cir. 1994) (apparent authority to consent to search of defendant's briefcase where both parties had access to its contents, the defendant gave third party permission to open it, and it contained possessions of both parties). Mr. Al Mujahid never gave the tub to Claudette, never told her what it contained, and took affirmative steps to ensure that Claudette could not access or use the interior of the storage tub.

***

Mr. Al Mujahid retained a legitimate expectation of privacy in the storage tub left at Claudette's residence. Claudette lacked actual or apparent authority to consent to the search of Mr. Al Mujahid's storage tub because she did not use the tub or have access to or control over the tub. Her consent was ineffective, and the government cannot rely on it to justify an exception to the constitutional requirement of a warrant to search the storage tub. The search, therefore, violated the Fourth Amendment.

9

**II.    This Court Should Suppress Evidence Seized During the Search of Mr. Al Mujahid's Residence Because That Search Was Not Justified by Exigent Circumstances.**

As discussed above, warrantless searches are presumptively unreasonable except under certain narrowly prescribed exceptions. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). One of these exceptions, the so-called "exigent circumstances" exception, allows police officers to search a residence without a warrant in order to protect or preserve life or prevent serious injury in the event of exigent circumstances. *Mincey*, 437 U.S. at 392–93. This exception "must be strictly circumscribed by the exigencies which justify its initiation." *Id.* at 393 (citation and internal quotation marks omitted). It cannot be used merely to make law enforcement more efficient, or to safeguard evidence that could be protected in another manner, or simply because a serious crime has been committed. *Id.* at 391–95. The exception is only satisfied "when probable cause and exigent circumstances exist." *United States v. Marshall*, 157 F.3d 477, 481 (7th Cir. 1998) (citations omitted). And exigent circumstances exist only if an officer has an objectively "reasonable belief that there [is] a compelling need to act and no time to obtain a warrant." *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006). The government bears the burden of proving that "its officers had an objectively reasonable basis for believing such exigent circumstances existed at the time of the warrantless entry." *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001) (citing *Marshall*, 157 F.3d at 482).

**A.    The search of Mr. Al Mujahid's residence was an illegal search because it was unreasonable for police officers to enter his residence.**

The police officers' purported justification for entering Mr. Al Mujahid's apartment was to find Caliph, Mr. Al Mujahid's son. According to the police reports, officers entered Mr. Al Mujahid's apartment in order to conduct a well-being search for a "missing child." *See, e.g.*,

Exh. B at 3. But Caliph was not missing, and no officer could have had an objectively reasonable basis for believing that he was missing. Even if a reasonable officer could have believed he were missing, no officer could have reasonably believed that entering Mr. Al Mujahid's apartment and conducting the search was necessary to locate Caliph. As such, exigent circumstances did not exist, and the search of Mr. Al Mujahid's apartment was illegal.

The evidence fails to establish that exigent circumstances existed for two reasons. First, the timing of the officers' actions on April 13 and inconsistencies in the reports describing those activities suggest that no officer could have reasonably believed that the child was missing. Had any of the officers reasonably believed that Caliph was missing, they would not have searched Claudette Gregory's apartment before beginning the "search" for Caliph. On the morning of the search, after Candace spoke with investigators, the police officers' first instinct was not to look for the allegedly missing child—it was to search Claudette Gregory's apartment, a location where no one believed Caliph was located. Rather than springing into action to look for a missing child, the police went to the apartment of Candace Gregory and searched for the guns that Candace wanted the police to find. *See* Exh. A at 1 ("CANDACE wanted to turn over some guns that belonged to her ex-boyfriend DWAYNE TIMBERLAKE.[9]"). After the initial search, the police took additional time to photograph and inventory the evidence they had found at the apartment. *See* Exh. I at 4.

The government might claim that the officers first learned of the missing child only after performing the search of Claudette Gregory's apartment.[10] But there are certain inconsistencies

---

[9] Dwayne Timberlake is Mr. Al Mujahid's birth name.
[10] The reports provided by the government are inconsistent on this key fact, which further casts doubt on any claim that the warrantless search of Mr. Al Mujahid's apartment was justified by exigent circumstances. Two FBI reports suggest that Candace learned that her son had not shown up at day care when CPD officers were first questioning her about the alleged domestic violence incident—before Candace went to the courthouse to file a restraining order and before police officers searched Claudette

11

in the reports that undermine this explanation. Namely, nothing of significance changed between the time Mr. Al Mujahid left with Caliph that morning and the end of the search of Claudette Gregory's apartment. Candace did not know anything more about Caliph's whereabouts when she talked to police officers at the courthouse than she did later, when the police officers were searching Claudette Gregory's apartment. At both times, Candace knew that Mr. Al Mujahid had taken her son, just like he usually did on weekdays so that Candace could go to work. If Candace had been worried about her son's whereabouts, she surely would have notified the police officers immediately when she first met up with them at the courthouse. And yet Candace did not insist that the police officers immediately look for her son; to the contrary, she returned to Claudette Gregory's apartment, where police officers were searching for firearms. And this search took time. It included an extensive processing phase during which evidence was collected and many photographs were taken.

There *is* an indication in some—but not all—of the reports that Candace found out during the processing phase of the search that her son had not shown up to day care that day. But none of these reports contain any information about how Candace allegedly found out that her son had not shown up at the day care. Indeed, these reports are completely silent on this key fact. *See* Exh. H at 1; Exh. A at 2; Exh. L (FBI Report) at 2. And this silence can be explained rather

---

Gregory's apartment. *See* Exh. B at 2-3 ("CPD arrived on scene and took a statement from Gregory about the incident. Gregory believed that TIMBERLAKE was taking their son to school but after calling the school she was informed that her son never showed up."); Exh. M (FBI Report) at 2 ("After GREGORY reported the assault to CPD officers and informed them that TIMBERLAKE had taken their son . . . . Later that day, GREGORY filed a restraining order against TIMBERLAKE.") However, other reports suggest that Candace allegedly told police officers that her son was missing during the inventory phase of the search of Claudette Gregory's apartment. *See* Exh. H at 1 ("While the guns were being photographed and processed CANDACE told officers that TIMBERLAKE had taken their son and she did not know where he was."); Exh. A at 2 ("While the guns were being photographed and processed CANDACE told officers that TIMBERLAKE had taken their son and she did not know where he was."); Exh. L at 2 ("While the guns were being processed CANDACE told officers that TIMBERLAKE had CALIPH and she did not know where they were.").

easily by a fact not mentioned in any of the reports: this was a day care facility, not a school, and there was no requirement that children attend the facility on any given day. Indeed, parents were free to drop their children off at the day care, and pick them up, whenever they pleased. Occasionally, Mr. Al Mujahid, just like many other parents who used the day care, would choose to spend the day with his son rather than drop him off at the facility. *See* Exh. C. Caliph's absence that day would not have led to a reasonable suspicion that he was missing and would not have prompted anyone at the facility to contact Candace. No one could have reasonably inferred that Caliph was missing merely because he was not at the day care that particular day.

Second, even if Candace suddenly, and for the first time, learned that her son was missing during the processing stage of the search, there was still no reason for the police officers to search Mr. Al Mujahid's apartment. That is because Velvet Cotton, Mr. Al Mujahid's sister, told Candace that Caliph was safely playing at Velvet's house before the police initiated the search of Mr. Al Mujahid's apartment. On at least two separate occasions, Candace and Velvet spoke on the phone, and during at least one of these conversations, Velvet told Candace that Caliph was at her apartment, playing with several family members, like he often did. *See* Exh. C at ¶6. Yet rather than going to Velvet Cotton's apartment to look for Caliph, police officers went to Mr. Al Mujahid's apartment, even though they had information that explicitly contradicted the theory that Caliph was at Mr. Al Mujahid's apartment. In this situation, a reasonable police officer confronted with information that the purportedly missing child was at the apartment of Velvet Cotton would have gone to that apartment before searching Mr. Al Mujahid's apartment.

13

**B. Even if entering Mr. Al Mujahid's residence was reasonable, the scope of the search was unreasonable.**

Even assuming, for the sake of argument, that the police were justified in entering Mr. Al Mujahid's apartment, the scope of their search was not "strictly circumscribed by the exigencies." *Mincey*, 437 U.S. at 393. In *Mincey*, the Supreme Court held that the scope of a warrantless search exceeded the emergency aid exception (a particular variant of the exigent circumstances exception) when investigating officers entered the premises to remove a wounded police officer but then conducted a "four-day search that included opening dresser drawers and ripping up carpets." *Id.* The Court concluded that the scope of the search could not "be rationalized in terms of the legitimate concerns that justify an emergency search." *Id.* The same situation occurred here. After police officers entered Mr. Al Mujahid's apartment, they found two firearms and some ammunition "under [a] dresser." Exh. I at 4. The police officers could not have expected to find a child underneath the dresser since no child could have fit there. And instead of leaving to continue to look for the purportedly missing child, the police stayed in the apartment to photograph the firearms and ammunition after moving them and then searched the rest of the apartment for documents linking Mr. Al Mujahid to the apartment. *See* Exh. I at 4. The duration and invasiveness of this search cannot be rationalized in terms of a desire to find an allegedly missing child.

***

The police seized evidence while conducting a warrantless search of Mr. Al Mujahid's residence. They justified this search as a well-being search for a "missing child." But no reasonable officer could have believed that the child was missing. And even if a reasonable officer could have believed the child was missing, no reasonable officer could have believed that searching Mr. Al Mujahid's residence in the manner done here was somehow necessary for

14

finding the child. The government cannot meet its burden of proof to satisfy the exigent

circumstances exception, and this search therefore violated the Fourth Amendment.

**III.  This Court Should Suppress Mr. Al Mujahid's Post-Arrest Statements Because There Is Insufficient Proof that Mr. Al Mujahid Received *Miranda* Warnings, Knowingly and Intelligently Waived His *Miranda* Rights, and Voluntarily Made the Statements.**

This Court should suppress all of Mr. Al Mujahid's alleged statements and any evidence

stemming from his unlawful interrogation for the following reasons: First, there is insufficient

evidence that *Miranda* warnings were provided to Mr. Al Mujahid. Second, if *Miranda* warnings

were provided, there is insufficient evidence that the waiver of rights was voluntary, intelligent,

and knowing; in fact, evidence suggests that the officers' questionable tactics may have made the

waiver involuntary. Third, the government's evidence is insufficient to find Mr. Al Mujahid's

waiver was voluntary. On all three of these points, the government bears the burden of proof in

order to justify the admission of a defendant's statements. *See United States v. Dickerson*, 530

U.S. 428, 439–41 & n.4 (2000) (discussing constitutional underpinnings of *Miranda v. Arizona*,

384 U.S. 436 (1966), and the need to safeguard "precious Fifth Amendment rights"); *see also* 18

U.S.C. § 3501. Unless the government meets this high burden in this case, Mr. Al Mujahid's

statements must be suppressed under the Fifth Amendment.

**A.  The government has not carried its burden of proving Mr. Al Mujahid was given *Miranda* warnings before his interrogation.**

A defendant's statements that are the product of a custodial interrogation are inadmissible

if *Miranda* warnings are not given first.[11] *See United States v. Ambrose*, 668 F.3d 943, 954 (7th

---

[11] It is undisputed that Mr. Al Mujahid was in custody at the time of interrogation because officers arrested him behind Velvet Cotton's residence and transported him to Area Central for processing. *See* Exh. E; *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) ("A person is 'in custody' for

Cir. 2012) (citing *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984)). The Seventh Circuit has indicated that an evidentiary hearing is warranted when a defendant seeking to suppress statements makes a prima facie showing of illegality and presents facts that are material and disputed. *See United States v. Randle,* 966 F.2d 1209, 1212 (7th Cir. 1992) (citations and internal quotation marks omitted). The government bears the "burden of demonstrating that proper *Miranda* warnings were given." *United States v. Wysinger*, 683 F.3d 784, 803 (7th Cir. 2012).

Mr. Al Mujahid disputes the government's assertion that he was given *Miranda* warnings. The government has provided no evidence that officers read Mr. Al Mujahid his *Miranda* rights aside from two cursory assertions in a police report that fail to identify the specific circumstances of the arrest, of any *Miranda* warnings, and of the interrogation. *See* Exh. E. There is no video or audio recording of any *Miranda* advisals or of the interrogation. Without this evidence, the government cannot carry its burden of proving that the officers properly Mirandized Mr. Al Mujahid.

### B. The government has not carried its burden of proving that Mr. Al Mujahid knowingly, intelligently, and voluntarily waived his *Miranda* rights.

Even if *Miranda* warnings are provided, when an interrogation occurs without the presence of an attorney and a statement is taken, a "heavy burden rests on the government," *Miranda*, 384 U.S. at 475, to demonstrate that "the statement was made following a voluntary, knowing and intelligent waiver of *Miranda* rights," *United States v. Jackson*, 300 F.3d 740, 748 (7th Cir. 2002) (citing *Miranda*, 384 U.S. at 475). The validity of the waiver depends on the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *Edwards v. Arizona*, 451 U.S. 477, 482 (1974) (citations omitted).

---

*Miranda* purposes if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal arrest.") (citation omitted).

Unless and until the government meets its burden of demonstrating that the defendant knowingly, intelligently, and voluntarily waived his rights, no evidence obtained as a result of the interrogation can be used against the defendant. *Miranda*, 384 U.S. at 479.

A waiver is involuntary if "the will of the defendant was overborne in such a way as to render his confession a product of coercion." *United States v. Upton*, 512 F.3d 394, 399 (7th Cir. 2008) (citation and internal quotation marks omitted). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The Seventh Circuit has indicated that courts should consider the totality of the circumstances in determining voluntariness, including the use of physical force against the defendant. *Upton*, 512 F.3d at 399 (citations omitted). Other considerations include the defendant's "mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment." *United States v. Spruill*, 296 F.3d 580, 589 (7th Cir. 2002) (citation omitted). A waiver-of-rights form "can be useful in demonstrating voluntariness." *United States v. D'Antoni*, 856 F.2d 975, 981 (7th Cir. 1988).

Mr. Al Mujahid's supposed *Miranda* waiver and subsequent statements came on the heels of an arrest in which CPD officers "roughed him up," banged his head against a squad car, and inflicted physical pain. *See* Exhs. J, K. The Chicago Police Department report does not indicate the time that Mr. Al Mujahid allegedly gave his statements, where he gave them, or to whom he gave them. *See* Exh. E. The government has not proffered enough evidence to show that the waiver was voluntary. This Court will need to know more about the totality of the circumstances before deciding this question; a hearing is therefore necessary. *See Upton*, 512 F.3d at 399.

Furthermore, the government has not proven that the purported waiver was knowing and intelligent. A waiver is knowing and intelligent if a defendant "at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction." *Spruill*, 296 F.3d at 589 (citation and internal quotation marks omitted). A waiver is only knowing and intelligent if the "suspect knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (citing *Colorado v. Spring*, 479 U.S. 564, 574 (1987)) (internal quotation marks omitted). Courts consider the totality of the circumstances in determining if the waiver was knowing and intelligent. *Spruill*, 296 F.3d at 589. (citation omitted). At a bare minimum, the government must proffer how officers advised Mr. Al Mujahid of his *Miranda* rights, how Mr. Al Mujahid evinced an understanding of these rights, and how he waived these rights.

The government has not offered sufficient proof to demonstrate that Mr. Al Mujahid waived his *Miranda* rights knowingly, intelligently, and voluntarily. As such, it has failed to meet its "heavy burden" of showing a valid waiver. *Miranda*, 384 U.S. 475.

## C. Mr. Al Mujahid requests an evidentiary hearing on the voluntariness of his alleged confession.

Even in cases—unlike this one—where the procedural safeguards of *Miranda* have been satisfied, a defendant in a criminal case is deprived of due process of law if the conviction is founded upon an involuntary confession. *Arizona v. Fulminante*, 499 U.S. 279 (1991); *Jackson v. Denno*, 378 U.S. 368, 387 (1964). The government bears the burden of proving not only that a confession was made, but also that the confession was voluntary. *Lego v. Twomey*, 404 U.S. 477, 483 (1972). In order to be voluntary, a statement must be the product of a rational intellect and

18

free will. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). In determining whether a defendant's will was overborne in a particular case, the totality of the circumstances must be considered. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also United States v. Montgomery,* 555 F.3d 623, 629 (7th Cir. 2009) (citations omitted). A confession is deemed involuntary not only if coerced by physical intimidation, but also if achieved through psychological pressure. "The test is whether the confession was 'extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence.'" *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam) (quoting *Bram v. United States*, 168 U.S. 532, 542–43 (1897)); *accord Malloy v. Hogan*, 378 U.S. 1, 8 (1964); *Townsend v. Sain*, 372 U.S. 293, 307 (1963); *Lord v. Duckworth*, 29 F.3d 1216, 1222 (7th Cir. 1994) (citations omitted).

This Court must make a factual determination as to whether a confession was voluntarily given prior to its admission into evidence. 18 U.S.C. § 3501(a). Under § 3501(b), this Court must consider "all the circumstances surrounding the giving of the confession," including:

> (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel, and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b). Without the presentation of evidence, this Court cannot adequately consider these statutorily mandated factors and other important factors bearing on voluntariness.

19

Accordingly, Mr. Al Mujahid requests that this Court conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine whether any statements made by him were involuntary.

**IV.      This Court Should Grant Leave to File Further Pre-Trial Motions as the Interests of Justice Require.**

In the interests of justice, defense counsel seeks leave to file additional motions, such as a motion to sever counts, which are contingent on the resolution of the instant motions.

<u>**REQUEST FOR RELIEF**</u>

For the foregoing reasons, Mr. Al Mujahid respectfully requests that this Court enter an order (1) suppressing the firearms that were seized as a result of the April 13, 2012, search of Claudette Gregory's apartment, as well as any and all fruits of that search; (2) suppressing the firearms that were seized as a result of the April 13, 2012, search of Mr. Al Mujahid's apartment, as well as any and all fruits of that search; and (3) suppressing all of Mr. Al Mujahid's post-arrest statements. In addition, Mr. Al Mujahid requests an evidentiary hearing to further clarify the contested facts contained herein. Finally, Mr. Al Mujahid requests leave to file additional motions, including a motion to sever counts, after this Court rules on the Fourth and Fifth Amendment motions.

Respectfully submitted,

By: <u>s/Erica Zunkel</u>
        Erica Zunkel

ERICA ZUNKEL
FEDERAL CRIMINAL JUSTICE CLINIC
UNIVERSITY OF CHICAGO LAW SCHOOL
6020 S. University Avenue
Chicago, Illinois 60637
(773) 702-0612

20

Written with:
Neil Conrad & Stephen Hagenbuch
University of Chicago Law School Class of 2013